23-726 Art v. McKesson Corporation 23-726 Art v. McKesson Corporation Mr. Shen, whenever you're ready. Good morning and may it please the court. Andy Shen for Appellant Relator, Adam Hart. This case involves a pervasive nationwide kickback scheme that skewed medical decisions and dramatically increased the cost to patients, insurers, and government health plans. McKesson was the largest wholesale drug seller to oncology practices in the country. From 2011 to 2019, it used legal kickbacks as the centerpiece of its nationwide sales strategy. It gave business tools, which it valued at $150,000 or more, to oncology practices for free. When you say business tools, this is not like a free back boat. Isn't this just saying, suppose McKesson said, we have a monthly newsletter that we will give you, which describes the latest research on drugs. And we have a hotline where someone will answer your questions about the efficacy of different drugs. Would that be a kickback? Well, Your Honor, what this business tool was... No, I asked you a question. Would that be a kickback? Well, the Second Circuit has very broadly defined the term kickback to mean anything of value used for the purpose of inducing the purchase or sale. Like their service? Like they say, look, we deliver the drugs to you overnight for free. And our competitors charge shipping and handling and don't get it to you for a week. Are they giving a kickback? No, not necessarily. Because you can compete on service as well as competing on price, right? That's legitimate, isn't it? Yes, you can compete on service. Explain to me why this tool is different than, say, the newsletter that provides information about the latest research on competing drugs. Well, a newsletter on competing drugs provides information on the drugs that the company is selling. What this specific tool does is shows oncology practices how to maximize its profits by changing from one drug to another drug based on the federal and private reimbursement rates. If they did their own research and did that, are they doing anything illegitimate? If they shift from one drug to a different drug, that makes the practice make more money? No, Your Honor, they're not. But what McKesson did was quantified how much it would cost that practice to construct that tool. And it quantified that value at $150,000 for a typical practice. Just to be clear, is it what the tool does or what the value of the tool is to the customer? No, it's what the value of the tool is to the customer, how much it would cost the customer to hire the employees to construct the tool and put the tool together. So what if Judge Lynch's newsletter was worth $10,000 to a customer? That was something they would otherwise have to pay for a subscription for? Yes. Then that would be an illegal kickback under the anti-kickback statute. Even if it was providing information that was valuable to the doctor in providing better service to the patient? Yes, Your Honor. The anti-kickback statute is very broad in its prohibition of providing. Yeah, it's so broad that we have to worry about it, don't we? Well, that's a- And the agencies have to worry about it. I don't know that I know of any other statute that says all this is illegal, but government agencies can create safe harbors whenever they think that's appropriate because we realize this is really too broad. Congress doesn't usually do that, right? The agencies certainly can create safe harbors, but it has to do that after notice and comment rulemaking. And McKesson hasn't identified any safe harbor that even arguably applies in this case. And the AKS is also unique in the sense that there is a regulatory procedure where any participant in the marketplace can ask for an advisory opinion to HHS before providing the kickback and ask whether or not it would violate the anti-kickback statute. Has anybody said that McKesson's use of these tools are illegal? DOJ, HHS, OIG, any regulatory commentary? The district court, in the opinion below, has said that this constitutes illegal remuneration. But HHS has not separately said that these tools are illegal. Do you know if the tools are still in use today? They are not in use as far as I know, at least not for this portion of McKesson's business. There is another segment of McKesson's business where it actually sells these tools and practices purchasing. To go back to just last year, the Supreme Court said that the False Claims Act requires proof that the defendant knew, not should have known, but knew that the claim was false, right? That's the shoot-against-super-value case. Well, the super-value case, the Supreme Court held that an objectively reasonable interpretation of the statute doesn't preclude a finding of scienter when the defendant didn't have that subjective belief. Right, because what is necessary is subjective knowledge. So if you subjectively believe that you're taking a substantial risk that you're doing something illegal, that'll do. And you can't defend it after the fact by saying, well, there is an objectively reasonable interpretation, even though at the time we had lawyers telling us that that doesn't work. That's telling us, isn't it, that the standard is one of subjective knowledge, or at least extreme recklessness, as to the illegality of the conduct, or the falseness of the claim, to be more precise. Well, I think what super-value is telling us is that the subjective belief of the defendant is what matters. Super-value didn't directly address the issue of what willfully means under the anti-kickback statute. No, it didn't. We were talking about the anti-kickback statute, but that's the next step, isn't it? How can you know that your claim is false if you don't know that you're violating the anti-kickback statute? In other words, what is false about the claims is the certification that we're in compliance with, among other things, the anti-kickback statute. So if you don't know that you're violating something that's a lawful requirement, how do you know that your claim is false? The term knowingly under the False Claims Act in this court, as many cases that have addressed it, includes reckless disregard. And the term knowingly has also been interpreted by the Supreme Court in the George case to mean knowledge of the underlying facts that constitute the offense. And so you can know that you submit a false claim if you also know that you're engaging in conduct deliberately, which is providing kickbacks to induce assail, which is reimbursed by the government. But the lawfulness, the falseness of the claim is tied to the violation of the anti-kickback statute. That's right. And the violation of the anti-kickback statute only happens at least outside of one circuit that has a weird decision that is totally inconsistent with everybody else who's addressed this. The falseness, the violation of the anti-kickback statute depends on knowing that what you're doing is unlawful. Well, Your Honor, I think your question goes to what is the definition of knowing and willfully mean under the anti-kickback statute? Yes. And what I direct the court to is the principles that this court announced in the U.S. v. George decision. That court said that the term willfulness is not defined generally in criminal statutes, and it's taken on many different meanings. Well, how about what we said just last year in FISA? Well, yes, Your Honor. FISA did say that the term willfully could be established by a voluntary and intentional violation of a known legal duty. And is your response to that that the footnote is dicta? Yes, Your Honor. It doesn't set forth the minimum level of scienter necessary. If I could just go back to the principles. Why isn't that, you know, I take your point that in FISA we said this is sufficient. We didn't say it's necessary. So that is still putatively an open question. But all but one of the circuits that have addressed this have said that willfully means knowing you're doing something illegal. This is a criminal statute. It's not just any criminal statute. It's one where the law is rather complicated to try to decide what's a kickback. You were saying before that maybe the newsletter isn't so bad because it's something that helps the doctor do better medicine. Well, maybe. But how are we to know those things? How are we to be able to figure out what is close to or within a safe harbor? How are we to figure out what's a kickback? These are complicated issues. So why isn't this rather like the tax code where willfulness means – actually means more. It means something that it doesn't mean in the anti-kickback statute, that you actually specifically know about a specific provision of law and that it violates that provision of law. But we've got cases all over the place saying that willfulness requires, for a criminal conviction anyway, that you acknowledge that you're doing something that violates the law. You don't need to know what the law is or exactly what it says. Yes, Your Honor. And let me start out by saying there are at least a dozen cases in this court and from the Supreme Court that have interpreted willfully to mean simply deliberate, intentional action. But going back to the actual principles- Well, let's suppose we do think that it means that you need to know you're doing something wrong. Could you tell me exactly what evidence here or what is pledged in the complaint that suggests that they knew they were doing something wrong, not just that your client thought they were doing something wrong? Yes, Your Honor. The complaint alleges that McKesson, one of the largest wholesale drug companies in the country with revenues of hundreds of billions of dollars, any company of that size and stature, as set forth in the allegations of the complaint, is intimately familiar with what is required by the AKS. It's set forth in its SEC disclosures. It is set forth in its contract with its customers. It's set forth in its internal compliance- So we're assuming because of the sophistication of the company, the knowledge of what's legal or not? No, Your Honor. Those documents actually say what the AKS requires. And it says the AKS prohibits offering anything of value with no exceptions, with no relevant safe harbors, to induce a sale that will be reimbursed by the government. Is free shipping something of value? Well, in order to provide a drug to somebody, you have to ship the drug to the practice. And lots of people, lots of companies, lots of businesses charge you for that service. Some don't. If most of the companies don't provide free shipping, and one of them does in this medical context, that's something of value, isn't it? Well, Your Honor, if there's any doubt at all as to whether or not something violates the AKS, there is a regulatory procedure for a participant to ask HHS in advance whether or not it violates the statute. Yeah, and that's precisely because you can't figure it out very well on your own. Well, I think what- Is there a requirement? Is anybody who doesn't use that service automatically engaged in willful misconduct? No, no. They are not automatically engaged in willful misconduct. But what that regulatory procedure shows is that if you follow that procedure, you cannot inadvertently violate the statute. But, Your Honor, you also asked what particular allegations there are in the complaint. And aside from the- The first thing you said, your number one argument, is they're a billion-dollar company. They must know because they're rich and sophisticated. Well, not only are they- Well, not really. That's not what you're saying. Not only are they a billion-dollar company, but they actually have internal documents setting out what is required by the AKS. It says you cannot offer things of value to induce purchases that are reimbursed by the government. And then McKesson- And yet they did this, and they advertised it, right? This was not like under-the-table payments. They did advertise it, Your Honor. But as the Eleventh Circuit said in Vernon, the AKS prohibits both overt and covert kickbacks. And so while the fact that a defendant could- It may prohibit them, but is it willful? Is it knowingly- Is it not evidence that you don't know that something is illegal that you do it out in the open? I mean, that is certainly evidence that could support a finding of willfulness, but it's not necessary under the AKS, particularly here. I think fundamentally, the way that you prove willfulness and intent to violate the law is to know what the law requires and then engage in conduct that violates the law, which is precisely what McKesson did here. It knows what the law requires because it's set forth in its internal documents, and then it engaged in a nationwide scheme that violates those very requirements. But there's also- But the question is whether this conduct violates that law, and that seems to be a pretty gray area. You're including things like a newsletter and free shipping, and it's not clear to me that those things are prohibited by the AKS. And I'm not sure what evidence you're pointing to in response to the original question that indicates that McKesson thought that such things were unlawful. Well, there are additional particular allegations in the complaint that this specific conduct violates the AKS. The complaint alleges that the relator, during a training session on the AKS, on McKesson's compliance policies, specifically raised this issue to his boss. He was the regional vice president and said that these conducts violate our internal compliance policies. What does it mean for McKesson to be willfully-to be acting willfully? I mean, what you just said is that Hart believed it, I think, to be unlawful or raised a concern about it. I don't even know if it's a belief to be unlawful. But wouldn't his supervisor or maybe above his supervisor also have to share that belief? In other words, who's the actor here, and what's their state of mind? What's the allegation about that? Yes, Your Honor. The supervisor would have to share that belief. But the natural, plausible, and reasonable inference to be drawn from the allegations is that when someone tells you during a compliance training that you're violating that specific compliance manual, the natural inference of that is that that at least raises a triable issue as to whether McKesson itself knew. And there are other allegations as well in the complaint. There's allegations that were later discussed, these particular business tools, with the creator of the business tool as well as with his colleagues. They discussed that it was wrongful and unethical to provide those tools, and the natural inference to be drawn from that is that if these colleagues believe that it was wrongful, then it's plausible that they also believe that it was unlawful, especially when they were trained in the requirements of what the AKS requires. The complaint also alleges that McKesson concealed its scheme by destroying documents, even after it had a duty to preserve those documents. After the government issued a CID in connection with this case, McKesson asked for later for his laptop, destroyed the contents of that laptop, even though it contained a trove of relevant documents. And there has been limited discovery in this case before the motion. You have a duplicate copy of the laptop contents, right? Yes, we do. Is there anything in your brief, let alone in the complaint, that points to particular documents that are actually, if not smoking gun, at least some evidence that isn't otherwise in the complaint that shows knowledge on the part of McKesson? There is no smoking gun that is in the laptop, but what the documents in the laptop show is how McKesson was using these business tools to obtain customers and how they were inducing those customers to purchase drugs and then knowing that they were submitting those drugs for government reimbursement. In addition to the return of the laptop, did McKesson ask for Mr. Hart to return documents that were extracted from the laptop, any records or copies that might not have been contained in the laptop? Documents other than what was in the laptop? Yes, documents that could have been extracted from the laptop, or was it just the laptop itself? The documents were, the laptop was forensically imaged, and a copy of the image was provided back to McKesson. But if the purpose was destruction, were they also seeking hard copies that might have been printed out? I believe any hard copy documents were either left with McKesson when the relator left the company. Let me clarify what I just said. In August of 2015, McKesson asked for the laptop to be returned. At that time, they had a duty to preserve documents. The relator provided the laptop itself back to McKesson. The relator kept a copy of the laptop on a hard drive. That hard drive during discovery was forensically imaged and was produced back to McKesson. Did the district court make any adverse inference from this or say anything about it? No, the district court did not. And the district court, at the time, we had not gone through discovery. We had started discovery, but depositions had not started at that time. Thank you, Counselor, for your preserved components for rebuttal. Good morning, Your Honors. May it please the court. I think I'll start with this constant refrain we heard about how McKesson is a sophisticated, large corporation. And, of course, it is. But I think Judge Abrams correctly observed that, if anything, that cuts against the plausibility of the allegations here. The allegations here at their core is that McKesson, one of the largest companies in the country, made a conscious and deliberate decision to violate federal law. And not just any federal law, but a federal felony criminal statute that could subject McKesson to hundreds of millions of dollars of liability for the decision makers of the company who made the decision. They could spend 10 years in jail for making this decision. And so, as the allegations are pled, after making this decision to commit a felony, McKesson then decided we shouldn't take steps to disguise our conduct. We should publicize it for the whole world to see, put it on our website. When those allegations came to the attention of the federal government, DOJ investigated, declined to intervene, didn't suggest that McKesson was doing anything wrong. You heard a suggestion that the tools are no longer available. You can go to McKesson's website today, find information about the regimen profiler. There's a page on the website where you can watch a video about how the regimen profiler works. This is the scheme. The marketing or whatever materials were taken down, and what it's now used for is a sale as a product and not a perk for some good customers. So what the complaint alleges is that the margin analyzer, one of the two tools, used to have a lot of references to it on the website, and now there's only one reference to it on the website. It's not clear what that helps in the reduced number, which that just as plausibly reflects a reduced in change in marketing priorities, as opposed to demonstrating conscious recognition that conduct was unlawful. But- Isn't the relevant question not, do they still have this tool and make it available? Isn't the relevant question, is this still given out for free to good customers, the way it was at the time that Mr. Barton made his complaint? So I would say the relevant question here is obviously goes to willfulness, and is there plausible allegations that McKesson knowingly and intentionally knew that it was violating the law? And I'd like to get to some of Judge Lynch's points about how the gray areas of the sort of determining what actually is a violation of the anti-kickback statute, but I think it's important to recognize that for purposes of willfulness, we kind of layer on this view of not only is it enough that a jury could reasonably find that this was a kickback, it was, did McKesson know that it was a kickback and intentionally do it knowing that this was a kickback? And this view of the anti-kickback statute that the relators advance to say anything of value violates the anti-kickback statute, that is contrary to at least 30 years of guidance from the Office of Inspector General. It's contrary to decisions from federal district courts applying the anti-kickback statute. It is hard to reconcile with the statute itself. You know, we heard a lot of mention about there is a process to seek an advisory opinion. It's relatively unusual, as I'm sure the court's aware, for Congress to mandate that an agency create a process for regulated entities to get an opinion to determine is my conduct lawful or is it unlawful? And it's hard to imagine why Congress would have thought it was necessary to create a process to get an opinion from OIG about whether something constitutes remuneration if the law was as simple as the relator says. If everything of value violates the anti-kickback statute, why do you even need a process? And if we look at- But some things clearly are kickbacks, right? If they were offering these doctors free trips to Las Vegas and prostitutes in the hotel room and free cocaine, you wouldn't be here arguing, would you, that there needs to be some internal memo saying, we realize all this is illegal, so keep it quiet. No, no, we wouldn't argue that. We would acknowledge that there are some actions that so clearly violate the anti-kickback statute that you would treat them differently. What we argue here is that spreadsheets that contain accurate and true pricing data is not a clear violation. And we have, going back to 1991, OIG recognizing that services provided in connection with a product you're selling doesn't violate the anti-kickback statute. And I think the example that OIG gave in 1991 is a helpful one. There it was faced with the question of, is it unlawful remuneration to provide a doctor with a computer? Obviously, that's an easy answer under the relator's test. A computer has substantial value. But what OIG said is, if that computer is only going to be used to print out lab results from the lab tests that the company is running, that wouldn't violate the anti-kickback statute because it's used for a limited service related to the product being sold. Now, if you gave them a computer that they could use generally for the office, I guess in 1991 they may not have been checking their email, but you could imagine that today, a general-use computer, that would implicate the anti-kickback statute. And that started in 1991. OIG, in 2003, issued guidance in the Federal Register that encouraged companies like McKesson to adopt compliance policies. And what it said there, it said any remuneration that you provide to doctors, it didn't say that it violates the anti-kickback statute. It says it potentially implicates the anti-kickback statute and deserves closer scrutiny. And that's why you'd want a compliance policy in place. But even in that guidance, again, it reiterated that product support services often don't violate the anti-kickback statute. Congress created this process in which companies could get advisory opinions. There's been at least a half a dozen opinions where the OIG has looked at services provided in connection with products and say they don't violate the anti-kickback statute. And so this reading of the anti-kickback statute that the relators are advancing here that says everything of value violates the anti-kickback statute. I think Judge Lynch, you were making a good point that I think with the newsletter, that just shows that you would pretty quickly reach some serious First Amendment problems if you were going to say somebody committed a felony by providing truthful information to a doctor. One of the allegations is that I guess after receiving the Ernst and Young analysis, Mr. Kaminsky sends some materials indicating the value of these tools to the customer saying you didn't get this from me. And then the complaint goes on to say this reflected knowledge that this was wrongful and unlawful. What's your response to that? I think Judge Abrams had it right when she looked at that. And what that was, it was 170 pages of attachments forwarded from one employee to another within McKesson across departments that didn't relate to the document itself. The underlying documents, the 170 pages, went into pretty detailed proprietary information about a particular practice and only had a few references to these tools. And so I think the problem in the stacking of inference on inference is, first you have to say that the cover email was referring to the margin analyzer and the regimen profiler, even though the documents were 170 pages and only had a couple references to them at all. So that's the first leap. It has to be talking about those. And then it has to be saying you didn't get it from me because these tools are illegal, as opposed to you're not authorized to have these documents because they were created for a different part of the company that you don't work for. And I think the more plausible inference when you have documents, confidential documents, transferred between two employees within the company is not that it's showing a knowledge that's unlawful. I don't know that it's implausible the way the plaintiff characterizes it. But isn't that the kind of thing, the intent that we infer from circumstantial evidence like this? What were they thinking? What did they mean? What did this cover email mean? And how would it reflect about a state of mind? But under Twombly and Iqbal, it has to be that the inferences have to rise to the level of plausible. It can't just be conceivable. And especially when you look within the entirety of the case and the allegations, the idea that the fact that one employee forwards documents to another employee and says, you didn't get this from me. That one, that the reason he said that is because he knows that the documents show that something is unlawful. And two, that the unlawful conduct that is purportedly alleged relates to these documents. It's stretching beyond too far. The document itself- The point really is the reference to these particular tools is not something that says we're doing something illegal. It's not something that isn't apparently widely known in the company in the first place. Right. It is Ernst & Young. This is what they point to of where they come up with the valuation. And what it actually says is there's a line item that says some consulting services. It lists five or six different types of services. And one is the margin analyzer. And it says if you didn't get all of these services from a different department of McKesson, you would have to hire an employee. And so that's where the price comes. No, there's no discussion. This was done by Ernst & Young. There was no determination of whether the program was lawful or unlawful. It was strictly data on the services that were provided to a single- But it is something that suggests that it is extremely valuable. And for purposes of the motion to dismiss, we're not challenging that. We would challenge that that is an appropriate way to determine value. But for purposes of this motion to dismiss and certainly going to willfulness, we don't have to challenge or aren't challenging whether they plausibly allege the tools had value. On willfulness, would this case have come out differently if the relator had raised these concerns to the legal department rather than to his supervisor? Not if the legal department disagreed with him. And so I think this is which I think they would have. And this kind of gets back to the standard. Part of his view is that McKesson, a sophisticated company, thinks that the anti-kickback statute prohibits providing anything of value without any exception when the law is clear that that's not the law. And so if he had provided that- The challenge, though, is not that the supervisor on receiving this information did any research or investigation or went out to legal. The answer was just, well, I don't think it's violent of the law. So the question is, would legal have done the same or would legal likely have done some research and looked into it? So a couple points. It certainly would have been different with legal. And if legal responded, as I expect they would have, to say it's not a violation of the law, that would have been enough to show that there's not willfulness. The allegation here is not that he told his supervisor that it was unlawful. It's that he told them that it violated the company's compliance policy. And I think that is a meaningful distinction, certainly under willfulness. It's not enough, and it can't be enough, to say a company violated its own internal policies. That is very different than saying a company acted unlawfully. If, you know, as I said earlier, OIG encourages companies to create- I mean, the problem is that the motion to dismiss stage, right? So we actually have no idea, and Hart has no idea, what the legal department might have thought. He has no idea what the supervisor did with his complaint other than to poo-poo it to Hart's face. And we don't know what he went back and did. We could find all that out in discovery. Well, but he has to plead it, right, at the pleading stage. And willfulness, especially, you know, even under a proper interpretation of the anti-kickback statute, which is much narrower than the relators, it's still a broad statute in terms of what constitutes remuneration. But what the court has acknowledged in cases like Pfizer is that, you know, criminal liability is limited by the willfulness requirement. And this is a very important limitation, that the defendant, to be criminally liable, has to knowingly and intentionally violate the law. And so if we say, like, he doesn't know because he doesn't know what people higher up in the company said, that's grounds for dismissal, as the judge correctly held. No further questions? Okay. Thank you, counsel. Mr. Shen, we'll hear revolving. Thank you, Your Honor. I think the court should remember here that we are dealing under the Rule 9b general pleading standard. And as counsel has acknowledged, all we have to plead is general facts that give rise to the plausible inference of Sienter here. And we cited numerous cases from the circuit courts in our briefs where even criminal convictions have been sustained on far less evidence. We cited the Seventh Circuit's decision in Mashiri, the Eighth Circuit's decision in Goodwin. And in those cases, the only evidence was that the defendant had signed a certification that they would comply with the AKS. There was no evidence that the defendant had read the AKS, that someone had explained to him what the requirements were. Of course not. But what were the facts there in terms of what the thing of value was in those situations? Are they not things that anyone would know would be bribes or kickbacks? Not necessarily, Your Honor. Give me your best one where there was something analogous to, the most analogous to what was going on here. Well, there are several district court cases, but focusing on the circuit court level in Mashiri, the issue there was that there was a teaching contract that had over time morphed into someone getting paid for providing referrals. And what the court there said, it wasn't necessarily obvious. So it's a no-show teaching job where what he's actually getting paid for is to make referrals. Not necessarily. Isn't that like the classic definition? Well, not necessarily that it was a no-show teaching job. Well, you say it morphed into being providing referrals. That's what the jury found was that ultimately the principal purpose of it was being paid for providing referrals. But what those cases- It just sort of puzzles me how this all works. Suppose your salespeople were, they have the tool. McKesson, not your salespeople, their salespeople. McKesson sells, like, lots of drugs, right? They're a wholesaler. They're not a manufacturer. So they sell Pfizer's drug and they sell Moderna's drug and they sell Merck's drug that are all roughly equivalent. And suppose I said, well, what – these all look to me from the medical journals to be pretty much equivalent. I could use one or the other. Do you happen to know which ones the government would reimburse me for at a higher rate or which ones – and by the way, what do you charge for these drugs and which one is cheapest? And the salesperson says, well, I don't know off the cuff, but I'll go home and look it up and let you know. That would be a thing of value? That's not actually what occurred here. They actually provided business terms to- Yeah, I know. But why is – there's a different way of providing the information. Their hotline, a consumer hotline that isn't a kickback will provide you that information. If you call up and ask about a specific drug – set of drugs for a specific illness, and they'll give you that information over the phone. I think it's very different providing it on a one-off basis versus a systematic tool that provides information for every- They've got the systematic tool back at the office. That's what they use to answer the inquiries, and they will answer any inquiry you make. This particular practice specializes in one thing. They're only interested in one drug, one class of drugs, and they can call up and get that information. Yeah, as the district court- That can't be given because that is a thing of value. Yep, as the district court correctly held, if you are giving the practice something that the practice itself would have to invest its own money in creating, then it is a thing of value. Yeah, but what they're interested in is the information, not the tool. The tool gives you information. So maybe the tool is a sophisticated thing that theoretically would cost $150,000 to reconstruct because you have to hire computer programmers and all those kinds of people. But to each practice, there may be only a couple of drugs that matter. They may want to look this up a couple of times, use this tool once or twice. That's not to say the tool is actually worth $150,000 to them. Now, I realize that's kind of a factual issue. Sure. But what I'm trying to get at, are you saying that providing that information is a thing of value? Yes, Your Honor. It may not be worth $150,000 to do it once, but it's worth something to the practice, and they will then use that information to do just what they used to for a year, which is to maximize their profits. I think- Kickback or no kickback? It's a kickback, Your Honor, because in your hypothetical, what is being provided is a consulting service. And kickbacks can not only be physical products but also consulting business services, and the case law bears that out. And that's consulting business services as opposed to a consultation. You know, do you happen to know of any up-to-date research that says one of these drugs is better than the other? That would also be a kickback, wouldn't it, if the salesperson knows that information and provides it? Well, we're talking right now at the margins of what is a kickback and what is not a kickback. I think taking the facts as alleged in the complaint, this is a question of plausibility, whether McKesson could have understood that what it was providing was an unlawful kickback. And given the other allegations in the complaint, not only that it knows what the AKS requires, but then it violated those requirements and the other allegations that we've talked about and the panel has asked about, including that he talked to his supervisor about these products and said that they were violating the AKS, that they destroyed documents, that a senior executive received documents indicating that they were worth $150,000, that another business unit actually sold the products to customers, meaning that customers would actually purchase that product separately. That is enough to lead to the plausible inference that not only is this a kickback, which the district court correctly held, but McKesson knew that it was unlawful to provide those services. Thank you, counsel. We'll take the case under advisement.